IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TRAVELERS PROPERTY CASUALTY | ) | |
| COMPANY OF AMERICA, | ) | Civil Action No. 05-647 |
| Plaintiff, | ) | |
| | ) | Judge Joy Flowers Conti |
| v. | ) | Magistrate Judge Lisa Pupo Lenihan |
| | ) | |
| CENTIMARK CORPORATION, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**REPORT AND RECOMMENDATION**

**I.  RECOMMENDATION**

It is respectfully recommended that the Defendants' Motion for Summary Judgment be denied as more fully set forth below.

**II.  REPORT**

This case involves claims related to the June, 2003 partial collapse of a roof on a large commercial building owned by Glimcher Properties LLP ("Glimcher LLP"), as to which a property insurance payment was made by Plaintiff, Travelers Property Casualty Company of

America ("Travelers"), to its insured, Glimcher Realty Trust ("Glimcher Parent").[1]  Travelers

seeks to recover on a subrogation claim filed against Defendant Centimark Corporation

("Centimark"), a roofing company located in Canonsburg, Pennsylvania, which installed a third

roof on the building approximately two years prior to the collapse.

      First, there exists at least a colorable claim that Travelers may, under the equitable

doctrine of subrogation, bring a claim originating from the property owner, Glimcher LLP,

despite its issuance of insurance on the property to Glimcher Parent.  See discussion, *infra*.  It

would appear, however, given the circumstances of this case, that Glimcher LLP is a necessary

party to any such action.  Second, Defendants' assertions to the contrary notwithstanding, the facts

of record regarding the express limited warranty issued after completion of the work but prior to

payment are insufficient to establish entitlement to summary judgment where fact questions

remain regarding, *e.g.*, Glimcher LLP's acceptance of the warranty terms, the sufficiency of

consideration, and whether any acceptance was induced by misrepresentation(s) regarding

complete performance of the contract.  Accordingly, Defendants' Motion for Summary Judgment

should be denied and Plaintiff allowed twenty (20) days from the date hereof to amend its

Complaint to properly include necessary parties and to allege more explicitly the basis for its

contention that it may bring this subrogation claim.

---

1.  Glimcher LLP and Glimcher Parent, which share a business address of 20 South Third St., Columbus, Ohio, are collectively referred to herein as "Glimcher".  As discussed, *infra*, a loose and inexacting maintenance of and/or regard for corporate distinctions between the limited liability partnership and its parent is suggested by the factual and procedural histories.  See, *e.g.*, Reply Brief in Support of Summary Judgment at 2 *et seq. (*defining Glimcher LLP as "Glimcher Properties" but repeatedly referring thereafter to "Glimcher", an undefined term); Plaintiff's Brief in Opposition (similarly referring to "Glimcher" without distinction).

A.  **Statement of Facts and Procedural History**

Glimcher LLP, a wholly-owned subsidiary of Glimcher Parent, owns a large commercial building known as Cambridge Plaza and located in Cambridge, Ohio.  Glimcher Parent maintained property insurance on Cambridge Plaza through Travelers, with no additional named insureds.  See Reply Brief in Support of Summary Judgment at 3-4. [2]

In January, 2000, Centimark corresponded with Glimcher Parent regarding its inspection of the roof at the Cambridge Plaza property and its project proposal.  At that time, Centimark issued a written proposal, prepared for and addressed to Glimcher Parent - for whom it had previously performed roofing work, to install a third layer to the roofs on the Cambridge Plaza property to address leaking and other concerns.  In general, portions of the existing roof(s) appear to have been in significant disrepair at the time and Glimcher was interested in a cost-efficient solution.[3]  Accordingly, Centimark proposed to apply a rubber membrane on the roof. The written proposal expressly provided that Centimark would retain a structural engineer to "visit the site prior to any work to make sure the building [could] handle the extra weight of the membrane."  See Centimark Proposal; see also Scope of Work at ¶ 16 ("We will have a state licensed structural engineer approve the building for the added weight.").  The proposal also provided for meetings and coordination with an "owner representative of Glimcher Realty

_____

2.  For factual statements, reference shall be made to the parties' memoranda or briefs as neither filed a concise statement of material facts as required by Local Rule 56.1.

3.  Cf. Defendants' Memorandum in Support at 1 (noting that the Cambridge Plaza shopping center had Save-A-Lot as a tenant, but became largely unoccupied owing to the Ames Department Store bankruptcy in 2002) id. at 13-14 (stating that Glimcher did not discuss removing the other two roofing systems "because it would have been too expensive").

Trust".  <u>See</u>  Scope of Work at ¶¶ 1, 7.  And it provided for a "comprehensive written warranty."
<u>See</u> Reply Brief in Support of Summary Judgment at 3.[4]

In November, 2000, a written Purchase Order was issued, in accordance with the
proposal, on the letterhead of Glimcher LLP and executed by that entity's Senior Vice President
of Property Management, John Hoeller.  The single-page Purchase Order attached Centimark's
Proposal to Glimcher Parent, but no separate contract was executed by Glimcher Parent.
Centimark completed its work on the roof, but never retained the structural engineering advice
called for under the contract.

Upon completion of the work in March 2001, but prior to payment of the $105,000
contract price by Glimcher, Centimark issued a written warranty (the "Warranty").  <u>See</u> Reply
Brief in Support of Summary Judgment at 9 (asserting that the warranty was issued on March 26
and payment received May 25).  The Warranty, containing terms assertedly known to Glimcher
through its prior course of dealings with Centimark,[5] was apparently received by one of the
Glimcher entities.  <u>See</u> Reply Brief in Support of Summary Judgment at 3 ("The warranty
received for the Cambridge Plaza project was identified and produced by a Glimcher
employee.").  Its provisions include limitation of liability language, transfer restrictions, notice
and time restrictions, and various exclusions.  <u>See</u> <u>id.</u> at 12-15.

---

4.  More specifically, the Proposal states that "[u]pon purchase of the roofing system, Glimcher
Reality [sic] Trust becomes entitled to receive the benefits of single source responsibility
through Centimark's comprehensive, written warranty."

5.  <u>See</u> Reply Brief in Support of Summary Judgment at 2 (explaining that Centimark "has
worked with" the Glimcher entities "for years"); <u>id.</u> at 3 ("This same warranty has been provided
to Glimcher Properties *and/or* Glimcher Realty numerous times before . . . .") (emphasis added).

In approximately March, 2003, the Cambridge Plaza building roof buckled and a few months later, in June, it partially collapsed.   Pursuant to its insurance contract with Glimcher Parent, Travelers investigated the building damage and its adjuster, Ross Koch, determined that it "was covered by the policy."  <u>See</u> Plaintiff's Brief in Opposition at 5.  Accordingly, Travelers' paid Glimcher Parent an amount in excess of $240,000[6] and filed its Complaint in this action in August, 2004.[7]  The various experts consulted since have expressed differing opinions regarding the causation of the collapse.[8]

Defendants now assert entitlement to summary judgment against Travelers, in essence, because Travelers insured the wrong party.  <u>See</u> Defendants' Memorandum in Support at 9 (stating the Glicher Parent "had no insurable interest"); <u>see</u> <u>also</u> <u>id.</u> at 9; Reply Brief in Support of Summary Judgment at 7 ("Centimark's proposal was accepted by Glimcher Properties"; therefore "Glimcher Realty Trust has no cause of action against Centimark"; therefore "Travelers

---

6.  The summary judgment pleadings contain no further reference to disbursal of and/or application of these funds.

7.  It should be noted that this action was filed with the United States District Court for the Southern District of Ohio, which exercised a discretionary transfer to this Court in 2005.   <u>See</u> Defendants' Memorandum in Support at 8 (noting that the Warranty is governed by Pennsylvania law).

8.  <u>See</u> Defendants' Memorandum in Support at 4-5.  These diverse opinions on causation also interplay, of course, with material fact questions regarding the effect (if any) of Defendants' failure to employ a structural engineer in November, 2000 and/or Centimark's other performance of the roofing contract.

To the extent Defendants' somewhat disjointed Memorandum in Support suggests that the record raises *no question* of material fact regarding *any* damages causally related to Centimark's failure to obtain inspection by a structural engineer, Defendants are in error.  <u>See</u> Memorandum in Support at 13.  <u>Compare</u> <u>id.</u> at 14 (citing experts as not "know[ing] if" or "believ[ing] that" the extra weight added by Centimark's installation of the rubber membrane contributed to or caused the roof failure/collapse) <u>with</u> <u>id.</u> at 15 ("The evidence establishes that the new membrane applied by Centimark was not the cause of the roof collapse.").

has no subrogation rights against Centimark"; therefore "Centimark is entitled to summary

judgment").

In the alternative, Defendants assert that, pursuant to the Warranty controlling

Centimark's liability to Glimcher, it is entitled to summary judgment in accordance with the

warranty's limiting provisions.  See Reply Brief at 8-9 (asserting that the contract clearly

provided for a written warranty, which was received by Glimcher); Memorandum in Support at

15- 18 (citing Act of God, failure/fault of other materials, inadequate maintenance, and change in

building usage exclusions, together with notice requirements); Reply Brief at 12-15 (reviewing

basis for summary judgment under Warranty).[9]


### B.  Motion for Summary Judgment; Burden of Proof

Summary judgment is to be granted only when "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a

matter of law." Fed. R. Civ. P. 56(c).   All doubts as to the existence of a genuine issue of

material fact are resolved against the moving party, and the entire record is examined in the light

most favorable to the nonmoving party.  See Continental Ins. Co. v. Bodie, 682 F.2d 436, 438

(3d Cir. 1982).  Finally, an issue of material fact is "genuine" if the evidence is such that a

---

9.  In proffering several arguments for their entitlement to summary judgment under the
Warranty, Defendants include an assertion that the Warranty's provision that it be the "complete
and exclusive warranty agreement" between the parties, superceding prior
agreement/communication "relating to the subject matter of [the] Warranty", thereby released
Centimark from any contractual obligation to hire a structural engineer.  See Defendants'
Memorandum in Support at 13.  This argument is without merit.

reasonable jury could return a verdict in favor of the nonmoving party.  See Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 248 (1986).[10]


**C.  Analysis**

**1. Travelers Subrogation**

Under the well-established equitable doctrine of subrogation, an insurance provider

stands in the shoes of its insured for a loss paid.  Thus, as Defendants duly observe, if the latter

has an insurable interest, the former has a right of action.  See Reply Brief in Support of

Summary Judgment at 6 (quoting Brikley v. Pealer, 341 Pa.Super. 432, 440 (1985) as noting that

a subrogee is generally "placed in the precise position of the one to whose rights he has been

subrogated").[11]

In the case at hand, it would appear that the insurer compensated Glimcher Parent for the

latter's subsidiary's loss.  It would further appear that Glimcher Parent, although not the owner of

the Cambridge Plaza property, conducted itself as the owner for purposes of the insurance

transaction.  More generally, it may be said that the Glimcher entities failed to respect their

---

10.  In setting forth its understanding of the summary judgment standard, this Court must note
that any reference to the same is entirely absent from Plaintiff's rather cursory and conclusory
Brief in Opposition.

11.  See also, e.g., U.S. Fire Ins. Co. v. Royal Ins. Co., 759 F.2d 306, 309 (3d Cir. 1985) ("The
basic idea of subrogation is that of substituting the insurance carrier for the insured in the
insured's action against a third party. . . . 'Subrogation is an equitable doctrine and is applicable
whenever a debt or obligation is paid from the funds of one person although primarily payable
from the funds of another.'") (quoting Anderson v. Borough of Greensville, 273 A.2d 512, 514
(Pa. 1971)) (additional citations omitted).

corporate forms and maintain their separateness.[12]  In the contemplation of the law, therefore, the insurer may raise an at least colorable claim that these entities were alter egos.[13]

Relatedly, it should be noted that the doctrine of subrogation addresses the equities as between an insured and the insurer (as opposed, *e.g.*, to the equities as between a wrongdoer and the insurer).  In the circumstances of this case - where Glimcher Parent held itself out as the proper insured of the Cambridge Plaza property, and has arguably acted as the alter ego of its subsidiary rather than maintain the corporate forms - it would be inequitable to permit Glimcher, having obtained the benefit of the insurance contract, to also retain without subrogation any

---

12.  Cf. Reply Brief in Support of Summary Judgment at 7 ("Defendant does not dispute that these are related companies, but they are separate legal entities.").

13.  Cf., *e.g.*, Craig v. Lake Asbestos of Quebec, Ltd., 843 F.2d 145, 150 (3d Cir. 1988) (holding that to pierce veil on alter ego theory, plaintiff must show that parent exercised dominion over "finances, . . . policy and business practice in respect to the transaction attacked, so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own").  Cf. also Plaintiff's Brief in Opposition at 5 (asserting that adjuster's testimony that coverage was warranted "at the very least creates an issue of fact that precludes summary judgment").  Plaintiff fails, however, to elaborate on any factual/legal analysis supporting this assessment.

In addition, although Plaintiff also asserts that "as a partnership owned by Glimcher Realty Trust, all property held in the partnership name is owned by Glimcher Realty Trust", it provides no further elucidation.  Plaintiff's Brief in Support at 4-5 (discussing LLP form, but citing only Ohio Revised Code § 1775.61, a provision which does not speak to property ownership). Compare Amer. Cast Iron Pipe Co. v. Commerce & Indus. Insur. Co., 480 So.2d 892 (Ala. 1985) (concluding that Alabama law treats shareholders as equitable owners of corporate assets, including real estate, and holding premises of subsidiary to be presmises of parent) with St. Katherine Insur. Co., Ltd. v. Insur. Co. of  N. Amer., Inc., 11 F.3d 707 (7th Cir. 1993) (declining to "believe that an entity's corporate existence can so casually be disregarded" absent, *e.g.*, failure to deal at arms-length).

8

claim of Glimcher LLP against Centimark.  Rather, the greater equity would lie in recognizing the claims of both the parent and its subsidiary as belonging to the insurer.[14]

      That said, Glimcher LLP appears to be a necessary party to this action and the circumstances may require adding it both (a) as a defendant to resolve its rights in the claim as asserted by Travelers and perhaps to obtain a declaration that the insurer owns such claims for, *e.g.*, breach of contract, implied warranty, and negligence/comparative negligence;[15] and (b) as a party plaintiff to pursue for the benefit of the insurer any potential recovery under an express warranty claim.  See Defendants' Memorandum in Support at 9-11 (asserting that subrogation of Glimcher LLP's claims under the Warranty is precluded by warranty terms prohibiting transfer, but following with inapposite citation to case law on the non-transference of a warranty on residential sale).[16]

---

14.  See Ragan v. Tri-County Excavating, Inc., 1994 WL 67703 (E.D. Pa. Mar. 2, 2004), *revers'd in part on other grounds*, 62 F.3d 501 (3d Cir. 1995) (evaluating - in determining that interests of justice warranted piercing corporate veil - extent to which corporations were regarded as one company); Fed. Insur. Co. v. Purex Industs., 972 F.Supp. 872 (D.N.J. 1997) (holding that questions of parties' expectations regarding insurance coverage of property once owned by subsidiary not named as insured precluded summary judgment); Rinck v. Rinck, 526 A.2d 1221, 1223 (Pa. 1987) (holding that corporate entity may be disregarded "whenever it is necessary to avoid injustice").

15.  It may be that, as suggested *supra*, circumstances warrant regarding Glimcher Parent and Glimcher LLP as a single entity/alter egos, or it may be that circumstances warrant application of the doctrine of equitable subrogation either directly as between Travelers and Glimcher LLP, or in two-steps, from the subsidiary to its parent to the parent's insurer.  See generally, *e.g.*, Tudor Develop. Group, Inc. v. U.S. Fidelity & Guar. Co., 968 F.2d 357, 361 (3d Cir. 1992) (discussing Pennsylvania case law and the prerequisites for equitable subrogation under the Restatement of Restitution, § 162).  Cf. United States v. Avila, 88 F.3d 229, 237 (3d Cir. 1996) (discussing doctrine of equitable subrogation and related goal of preventing unjust enrichment).  Neither party's briefing on summary judgment is adequate to support more than a denial of the Motion at this time.

16.  Cf.  Reply Brief in Support of Summary Judgment at 5-6 (citing Prudential-LMI

(continued...)

## 2. Express Limited Warranty

In the alternative, Centimark suggests that it is entitled to summary judgment on various theories premised on the Warranty assertedly interposed.  More particularly, Centimark alleges that the Warranty enforceably controls Defendants' obligations to Glimcher LLP because it is not a separate writing or modification to the contract, but merely provides an explanation of (or "further details regarding") an express term in the contract, consideration for which was the contract purchase price.  See Reply Brief in Support of Summary Judgment at 9-10.[17] Defendants' also assert that the Warranty terms should be held to have been part of the roofing contract owing to the prior course of dealings between Centimark and Glimcher.  See id. at 10-11 (citing Westinghouse Electric Co. v. Murphy, Inc., 425 Pa. 166 (1967) as reading indemnity agreement into contract between parties where sometimes "work would begin" on project before purchase order containing same indemnity terms was provided); id. at 11-12 (citing Deposition

---

16.  (...continued)
Commercial Ins. Co. v. Windemere Corp., 1995 WL 563824, *2 (E.D. Pa. Sept. 21, 1995) for the proposition that *additional insureds* on policy should not be added as named plaintiffs because insurer, as subrogee to the rights of each, was real party in interest).

Plaintiff also suggests that it may be entitled to pursue "express warranty" claims under the language of the executed roofing contract (which attached Centimark's written proposal, with its express references to a five year warranty), while disavowing the limitations of the Warranty issued by Centimark on March 26, 2000.  See Plaintiff's Brief in Opposition at 9.  However, Plaintiff again fails to provide this Court with the benefit of any supportive legal analysis.

17.  Defendants' observation at this point in the Reply Brief appears to acknowledge the factual contentions between the parties as to the Warranty.  See id. at 10 (asserting that the Warranty "is admissible as evidence of the terms to which the parties agreed" during negotiations).  Compare Plaintiff's Brief in Opposition at 8-9 (asserting that it is a separate, unnegotiated writing constituting inadmissible extrinsic evidence).

testimony of Centimark's Senior Vice President of Safety and Risk, Brian Raymore).[18]  But see

Plaintiff's Brief in Opposition at 3 (citing Raymore's deposition testimony that, following

agreement on a contract or purchase order, "that information is sent to Corporate, and that's what

determines the warranty" as factual support for Travelers' position that the Warranty was not part

of the original contract).

   In addition to those already observed above, several other material questions exist with

regard to the express warranty which Defendants seek to interpose as a limit of liability, *e.g.*:

   (1) Whether Glimcher LLP's prior course of conduct with Centimark, or subsequent

payment without protest, constituted acceptance of the proffered terms, which terms were not

within the written roofing contract and as to which Glimcher has denied discussion/negotiation;[19]

---

18.  As noted *supra*, because "Glimcher" is an undefined term in Defendants' Reply Brief, it is
unclear whether/when Defendants' allegations of  prior course of conduct may refer to dealings
with/information known to Glimcher LLP as opposed to Glimcher Parent.  Cf. Plaintiff's Brief in
Opposition at 4, n. 1 (citing Deposition testimony of John Thiesen, Glimcher 's property
manager, that he had never seen the version of the written warranty document presented as a
deposition exhibit); Defendants' Memorandum in Support at 4 (describing Thiesen as the
employee who "maintained the Cambridge Plaza from 2000-2004 and negotiated the acceptance
of Centimark's roofing proposal for Cambridge Plaza").

19.  See, *e.g.*, Reply Brief in Support of Summary Judgment at 3(asserting that although
Travelers "claims that there were no negotiations about the terms of the warranty", Centimark
discusses the warranty "during the sales process" and that such discussions occurred between
Centimark and Glimcher LLP).  See also Hammermill Paper Co. v. Pipe Systems, Inc., 581
F.Supp. 1189 (D.C. Pa. 1984) (noting that, in Pennsylvania, purchaser of roof cannot recover
under strict liability theory but that he is "generally in a position to guard against [economic]
losses by bargaining for warranty protection") (citing to Pennsylvania's adoption of Uniform
Commercial Code § 2316); *infra* n. 23.

Cf. CitiSteel USA, Inc. v. Gen. Elec. Co., 2001 WL 65740 (D. Del. 2001) (holding that warranty
was incorporated into contract where contract so provided and where buyer was given warranty
provisions in advance and had opportunity to negotiate); Smith v. Reynolds Metal Co., 323
F.Supp. 196 (M.D. Pa. 1971) (assessing limitations of roofing warranty issued after work

(continued...)

(2) Whether there was, to the extent necessary, sufficient consideration for the warranty;[20]

(3)  Whether, to the extent the warranty terms were accepted, such acceptance was induced by Defendants' express or implied representation of complete performance (*i.e.*, including evaluation and approval by a structural engineer).[21]

More fundamentally, this Court's preliminary review of the case law suggests that, despite its title, the document at issue is not so much a "warranty" as a "service contract."[22]  See Liberty Lincoln-Mercury, Inc. v. Ford Motor Co., 171 F.3d 818, 822-23 (3d Cir. 1999) (explaining that Black's Law Dictionary defines a warranty as "referring to and ensuring the character, quality or fitness" of goods, which representations are made as a part of a contract for sale); id. at 823 (explaining that although Black's also includes, as a subspecies of warranty, contracts that only promise to repair (known as "extended service warranties"), such contracts need not be part of the original contract). See also id. (finding the Uniform Commercial Code's

---

19.  (...continued)
completion but executed by all parties).

20.  Compare id. at 9 (wherein Defendants contend that "[t]he consideration for this warranty is the original purchase price") with Plaintiff's Brief in Opposition at 6-7 (discussing absence of valid consideration for this asserted contract modification).  Here again the parties provide little by way of doctrinal/precedential support for their assertions.

21.  See, e.g., Deposition testimony of John Thiesen (indicating that he believed the engineering inspection was completed prior to application of the additional roofing material).

22.  The Warranty is headed "Non-Prorated Limited Roof Warranty"; it provides, however, that Centimark "warrants to the Purchaser ONLY that Centimark will repair any leaks resulting from defects in the materials or workmanship in the roof services . . . ."

definition of an express warranty - as created when a seller promises that the good sold will conform to some particular standard - "compelling").[23]

Thus, on the factual record before it, this Court cannot say with certainty that Plaintiff will be unable to make a sufficient showing regarding the inapplicability of the warranty or service contract terms.  Cf. id. at 825 (concluding that material fact questions as to whether automobile manufacturer's extended service plans contained warranties precluded summary judgment).[24]  Finally, as noted *supra*, the Complaint herein raises claims that may be unaffected by the validity of the Warranty.

---

23.  Cf. Bulova Watch Co., Inc. v. Celotex Corp., 389 N.E.2d 130, 132-33 (N.Y. Ct. App. 1979) (distinguishing guarantee of roof condition/performance from agreement to repair).

24.  To the extent the Warranty purports to disclaim/exclude other express or implied warranties, it may become necessary to consider whether, even if otherwise applicable, the document effectively limits Centimark's liability and/or does not run afoul of the common law doctrine of unconscionability.  See 13 Pa. C.S.A. § 2316, Comment (noting that section on limitations of liability is "designed principally . . . to protect a buyer from unexpected and unbargained language of disclaimer by denying effect to such language when inconsistent with language of express warranty" and to otherwise protect a buyer from surprise).  Cf. *e.g.,* Orleans Parish School Bd. v. Good Year Tire & Rubber Co., 1995 WL 373293 (E.D. La. 1995) (holding that to constitute an effective limitation of liability, a roofing warranty's terms were required to be (a) contained in the contract of sale or similar document (b) clear and unambiguous, and (c) brought to the buyer's attention or explained to him).

As was observed with respect to Traveler's subrogation rights over Glimcher LLP's claims against Centimark, *supra* n. 14, the party's briefs on summary judgment do not provide factual and/or legal analysis sufficient to support a determination beyond denial of the Motion at this time.

## III. <u>CONCLUSION</u>

For the reasons set forth herein, it is recommended that Defendants' Motion for Summary Judgment be denied.  It is further recommended that should this Report and Recommendation be adopted by the District Judge, Plaintiff be accorded twenty (20) days from the date of the memorandum order to amend its Complaint to include the necessary parties and to allege more explicitly the basis for its contention that it may bring this subrogation claim.

In accordance with the Magistrates Act, 28 U.S.C. § 636(b)(1)(B) and (C), and Rule 72.1.4(B) of the Local Rules for Magistrates, the parties are allowed ten (10) days from the date of service to file objections to this report and recommendation.  Any party opposing the objections shall have seven (7) days from the date of service of objections to respond thereto. Failure to file timely objections may constitute a waiver of any appellate rights.


 /s/Lisa Pupo Lenihan
LISA PUPO LENIHAN
United States Magistrate Judge


Dated: June 20, 2006


cc:    The Honorable Joy Flowers Conti
       United States District Judge

       All Counsel of Record